# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 4, 2025          Decided July 7, 2026

No. 24-7152

ZIA CHISHTI AND SARAH POBERESKIN,
APPELLANTS

v.

TATIANA SPOTTISWOODE, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:22-cv-03490)

———

*Christopher G. Michel* argued the cause for appellants. On the briefs were *Benjamin G. Chew* and *Andrew Crawford*.

*Matthew C. Daly* argued the cause for appellees. With him on the brief were *Mark Bailen*, *Martin S. Hyman*, *Jason R. Waters*, *John L. Slimm*, *Jeremy J. Zacharias*, *John D. Taliaferro*, and *Nicole Travers*. *John Palenski* entered an appearance.

Before: CHILDS and PAN, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court by *Senior Circuit Judge* ROGERS.

ROGERS, *Senior Circuit Judge*: This is an appeal from the dismissal with prejudice of an amended complaint seeking compensatory and punitive damages, rescission of an arbitral award, and other relief for alleged defamation and related claims under District of Columbia law. The district court described this litigation as "a not-so-thinly veiled attempt to undo the outcome of an arbitration that rejected Chishti's account of events and ruled in Spottiswoode's favor." *Zia Chishti, et al. v. Tatiana Spottiswoode, et al.*, No. 1:22-cv-03490 (D.D.C. Sept. 30, 2024) (Mem. Op. at 6). For the following reasons, this court affirms. Succinctly put, Zia Chishti's defamation and false light claims based on Tatiana Spottiswoode's testimony before Congress, as well as Chishti's related breach of contract claim, are protected under District of Columbia law by a common law privilege for witnesses communicating information to a legislative body and therefore not actionable. Spottiswoode's and her attorney's statements to the news media and on social media after Spottiswoode's congressional testimony as well as republications of Spottiswoode's testimony, are opinions protected by the First Amendment to the Constitution and the fair reporting privilege, and therefore also not actionable. Chishti's other tort claims are duplicative of his defamation claim, while his conspiracy claim and his wife's claim for loss of consortium fail in the absence of underlying torts.

## I.

According to the amended complaint, Chishti and Spottiswoode were in a "consensual romantic relationship" that was "on-and-off" between December 2014 and January 2017 and thereafter revived between July and October 2017. Am. Compl. ¶¶ 15, 41. Chishti was Chief Executive Officer of Afiniti, a technology company, and an executive of The Resource Group ("TRG"), an investment company. *Id.* ¶¶ 8, 22, 91. Spottiswoode, whose father James Spottiswoode was

TRG's Chief Scientist, *id.* ¶ 65, joined Afiniti in April 2016, after graduating from college. *Id.* ¶¶ 22, 106. Her employment contract contained an arbitration agreement requiring all future claims against Afiniti and its officers, among others, to be resolved in confidential arbitration under the rules of the American Arbitration Association. *Id.* ¶¶ 23–24; Ex. A at 7.

In October 2017, acting through attorney Michael Zweig, Spottiswoode accused Chishti of "harassment and assault." *Id.* ¶ 58. She demanded $50 million to settle her claims or she would file a lawsuit, and she threatened to sue Afiniti as well. *Id.* ¶¶ 60–61. Afiniti and Chishti initiated arbitration proceedings in December 2017. *Id.* ¶ 63. The arbitrator issued protective orders on exceptions to the non-disclosure agreement and the confidentiality of arbitration materials. *Id.* ¶¶ 175–76; Protective Order No. 3 (May 9, 2018), Ex. K; Protective Order No. 9 (Aug. 6, 2018), Ex. B. After Spottiswoode's father resigned as Chief Scientist, TRG also initiated arbitration proceedings on September 13, 2018, based on his alleged theft of trade secrets. *Id.* ¶¶ 65, 66. On April 19, 2019, following discovery and a hearing, an Arbitral Award issued in Spottiswoode's favor. *Id.* ¶ 279.

Over two years later, Spottiswoode was subpoenaed by Congress to testify before the House Judiciary Committee on November 16, 2021, *id.* ¶ 246, regarding H.R. 4445, 117th Cong. (2021), a Bill to amend the U.S. Code "with respect to arbitration of disputes involving sexual assault and sexual harassment" that was introduced in the House of Representatives on July 16, 2021. *Id.* at 1. The day before the hearing, Spottiswoode submitted her proposed testimony to the Committee and informed Chishti of the hearing and her subpoena to testify. *Id.* ¶¶ 106, 187. Committee staff denied Chishti's request on that date to offer evidence and testimony to refute Spottiswoode's account. *Id.* ¶ 78. Spottiswoode and other women offered public testimony on November 16.

*Id.* ¶ 81.   On March 3, 2022, President Biden signed into law the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("the Act"), Pub. L. No. 117–90, 136 Stat. 26 (codified as amended in scattered sections of 9 U.S.C.**)**. A copy of the Arbitration Award was filed by the Chairman of the House Judiciary Committee in the Congressional Record on December 17, 2022.   *Id.* ¶ 96.

A month earlier, on November 13, 2022, Chishti and his wife, Sarah Pobereskin, filed a *pro se* sealed complaint against Spottiswoode, her attorneys Nancy Smith and Michael Zweig, Spottiswoode's father and his attorney, Edward Johnson, and various John Does, individually and collectively.   *Zia Chishti, et al. v. Tatiana Spottiswoode, et al.*, No. 1:22-cv-03490 (D.D.C. Nov. 13, 2022).   A second complaint filed by Chishti on March 22, 2023, in the Superior Court of the District of Columbia was consolidated by the district court upon Spottiswoode's motion for removal.   Order at 1 (May 12, 2023).   On the same day, the district court struck the first complaint for failure to comply with Federal Rules of Civil Procedure 8(a)(2) and 12(f).   *Id.* at 2.

On June 30, 2023, Chishti and his wife filed an amended complaint, which the district court unsealed.   Am. Compl. (June 30, 2023); Min. Order (Jan. 25, 2024).   Chishti alleged that Spottiswoode's congressional testimony and related actions by her and attorney Smith were part of "an elaborate, and arguably extortive, smear campaign . . . falsely accusing Chishti of sexual misconduct and other offensive acts."   Am. Compl. ¶¶ 1–2. Further, that they had "developed a plan to secure Spottiswoode an opportunity to provide testimony in front of Congress," *id.* ¶ 71, and then "commenced a scorched earth public relations campaign aimed at reinvigorating numerous claims against Chishti," including posts on *Twitter*, a social media platform, and statements published in *The Telegraph*, a British newspaper, *id.* ¶¶ 83, 84–88, in order "to destroy Chishti from a reputational, professional, and financial

standpoint," *id.* ¶ 307. In doing so, Chishti alleged, they also breached protective orders issued in the arbitration. *Id.* ¶¶ 179, 197. As a result of their "defamatory statements and blackmail," Chishti alleged that he was "forced" to resign from his executive positions at Afiniti on November 18, 2021, and at TRG on November 28, 2021, *id.* ¶ 91. After his resignation, Chishti alleged, in order "to halt Spottiswoode's and Smith's ongoing media barrage against the company itself," TRG settled its arbitration with Spottiswoode's father "paying him money even though he [allegedly] had stolen . . . trade secrets." *Id.* ¶ 92. Chishti's wife filed a claim for loss of consortium against Spottiswoode and her two attorneys due to "psychological harm" allegedly suffered as a result of their "defamatory allegations." *Id.* ¶ 312.

On September 30, 2024, the district court granted Spottiswoode's and the other appellees' motions to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and dismissed the complaint with prejudice. Mem. Op. at 6 & Order at 1 (Sept. 30, 2024). Chishti and his wife appeal.

**II.**

This court reviews *de novo* a dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court will "accept the operative complaint's well-pleaded factual allegations as true and draw all reasonable inferences" in the plaintiffs' favor. *N. Am. Butterfly Ass'n*, 977 F.3d at 1249. "In determining whether a complaint fails to state a claim, [the court] may consider only the facts alleged in the complaint, any

documents either attached to or incorporated in the complaint[,] and matters of which [the court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). The court "need not accept inferences unsupported by facts or legal conclusions cast in the form of factual allegations," *City of Harper Woods Emps.' Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009), nor "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice." *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004).

The Arbitral Award in the Congressional Record and the related legislation are "public records subject to judicial notice on a motion to dismiss." *Id.* at 965. The Arbitral Award, which was appended to Smith's motion to dismiss and the authenticity of which is not disputed, may also be considered because it is "referred to in the complaint" and is "integral" to Chishti's defamation and related claims. *Id.*; *see, e.g.*, Am. Compl. ¶¶ 95–97, 178, 279.

Because Chishti seeks recovery under District of Columbia law, Am. Compl. ¶¶ 5–7, the court applies the substantive law of the District of Columbia and endeavors "to achieve the same outcome . . . [that] would result if the District of Columbia Court of Appeals considered this case." *Novak v. Cap. Mgmt. & Dev. Corp.*, 452 F.3d 902, 907 (D.C. Cir. 2006).

## III.

Counts I and II: Defamation and False Light. Chishti alleges that he has suffered reputation injuries as a result of Spottiswoode's testimony before the House Judiciary Committee on November 16, 2021, that was part of "an elaborate . . . smear campaign perpetrated by the Defendants" in the District of Columbia, and "directed at residents of the

District of Columbia." Am. Compl. ¶¶ 1, 5–6. The alleged defamatory statements are Spottiswoode's written and oral statements to the House Judiciary Committee in November 2021 and statements attributed to her and attorney Smith published in *The Telegraph* and Smith's posts on *Twitter*.

To plead defamation under District of Columbia law, a plaintiff must plausibly allege:

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement met the requisite standard; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

*Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1240 (D.C. 2016), *as amended* (Dec. 13, 2018) (internal punctuation and footnote omitted) (quoting *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005)). And the plaintiff must plausibly allege "that a 'reasonable listener' could think that [the defendants were] referring to [him]." *Browning v. Clinton*, 292 F.3d 235, 247 (D.C. Cir. 2002). "Though invasion of privacy false light is distinct from the tort of defamation, the same First Amendment protections apply." *Khodorkovskaya v. Gay*, 5 F.4th 80, 85 (D.C. Cir. 2021) (quoting *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001)); *Blodgett v. Univ. Club*, 930 A.2d 210, 222–23 (D.C. 2007). "And a plaintiff may not avoid the strictures of the burdens of proof associated with defamation by resorting to a claim of false light invasion." *Khodorkovskaya*, 5 F.4th at 85 (quoted citation and internal quotation marks omitted).

Separate analyses apply to Spottiswoode's statements to Congress and to her and her attorney Smith's post-hearing statements.

**A.**

Chishti's claims about Spottiswoode's statements to Congress fail under the common law privilege for statements to the legislature. This court has previously examined the relevant District of Columbia law in two opinions discussed by the district court. Mem. Op. at 10–14. In *Webster v. Sun Co.*, 790 F.2d 157 (D.C. Cir. 1986) ("*Webster II*"), this court concluded that "a common law privilege for communications to the legislature" in Section 590A of the Restatement (Second) of Torts "accurately 'reflects'" District of Columbia law. *Id.* at 160 (citation omitted). Under the privilege, "[a] witness is absolutely privileged to publish defamatory matter as a part of a legislative proceeding in which he is testifying or in communications preliminary to the proceeding, if the matter has some relation to the proceeding." *Id.* at 159 n.2 (quoting Restatement (Second) of Torts § 590A (1977)).

Chishti maintains that the privilege is inapplicable to Spottiswoode's written and oral statements before the House Judiciary Committee under *Webster v. Sun Co.*, 731 F.2d 1 (D.C. Cir. 1984) ("*Webster I*"), because her statements were "unsolicited" and "made in bad faith." Appellants' Br. 21. In *Webster I*, an employee of Sun Company sent the Congressional Research Service ("CRS") an unsolicited memorandum allegedly libeling a competitor, Sherwood Webster, and disparaging a device he invented. 731 F.2d at 2–3. Webster sued for libel and disparagement of product, and Sun Company defended on the ground that its statements to Congress were absolutely privileged under the District of Columbia common law privilege for communications to a legislative body. *Id.* at 3. This court held that for the legislative privilege to apply, a party must show that the

unsolicited statements were made with "intention to inform the legislative body on a subject properly within its jurisdiction," and that the statements had "some relation to the legitimate legislative business to which it is addressed." *Id.* at 5. The district court had granted summary judgment for Webster, ruling that the legislative privilege applied because the memorandum had a "relation to" CRS's activities. *Id.* at 2–3. This court remanded for the district court to make "sufficient factual findings" to determine whether the statements were made with "intent to inform" the CRS, *id.* at 6–7, and subsequently affirmed the dismissal of the libel action as privileged after the district court found the statements were made with both the intent to inform and a "self-serving motive," *Webster II*, 790 F.2d at 161–62.

It is undisputed that Spottiswoode's oral and written statements before the House Judiciary Committee had a "relation to" Congress's ongoing consideration of pending legislation on the forced arbitration of sexual assault claims. The district court ruled that the intention requirement in *Webster I*, 731 F.2d at 5, was inapposite because Spottiswoode's statements were solicited. Mem. Op. 13. Even so, Spottiswoode's statements met *Webster I*'s intention requirement because they were made pursuant to a congressional subpoena during the pendency of a bill on the forced arbitration of sexual assault claims, which was the subject of Spottiswoode's testimony, and therefore made with the "intention to inform the legislative body." *Webster I*, 731 F.2d at 5.

Chishti's bad faith claim is also misplaced. Even if as alleged Spottiswoode's statements were made "to defame and damage [him], gain litigation advantage, and for personal gain," Appellants' Br. 27, a party may have a dual motive in making a statement to the legislature and still receive the benefits of the privilege so long as the statement is also made with an intent to inform. *Webster II*, 790 F.2d at 161.

Spottiswoode's statements comport with *Webster I* and Chishti points to no contrary authority. The court, therefore, need not consider whether Chishti sufficiently alleged bad faith, and likewise has no occasion to invoke an *Irons* footnote to reverse *Webster I* insofar as it applied a "bad faith" test.

**B.**

Chishti fares no better in contending that the district court erred as a matter of law in ruling the post-hearing statements by Spottiswoode and her attorney Smith to *The Telegraph* and in posts on *Twitter* were protected opinion and subject to the fair comment and fair reporting privileges. Appellants' Br. 29. Many of these statements are protected opinion because they do not express verifiable facts that are capable of defamatory meaning; the rest are covered by the fair reporting privilege.

"Under the First Amendment, liability for defamation arises only if, at a minimum, a defendant's statement 'reasonably implies false and defamatory facts.'" *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990)); *see Competitive Enter. Inst.*, 150 A.3d at 1241. The First Amendment implicitly provides three protections, for: (1) "statements that cannot reasonably [be] interpreted as stating actual facts about an individual." *Farah*, 736 F.3d at 534 (internal quotation marks omitted). (2) "a statement on matters of public concern [that] must be provable as false before there can be liability under state defamation law . . . where a media defendant is involved," *id.* (quoting *Milkovich*, 497 U.S. at 19–20), because "a defendant cannot be held liable unless the alleged defamatory statement or implied premise is 'verifiable,'" *id.* (quoting *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 317 (D.C. Cir. 1994) ("*Moldea II*")). Thus, "[w]here a statement is so imprecise or subjective that it is not capable of being proved true or false, it is not actionable in defamation."

*Id.* at 534–35. (3) a "disputed statement [] 'reasonably capable of defamatory meaning.'" *Id.* at 535 (quoting *Weyrich*, 235 F.3d at 623). A defamatory statement "tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Weyrich*, 235 F.3d at 627 (quoting *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1293–94 (D.C. Cir. 1988)). But it is not enough for the "allegedly defamatory remark" to be "unpleasant or offensive; the language must make the plaintiff appear 'odious, infamous, or ridiculous.'" *Id.* (quoting *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984)). Whether a statement could reasonably be understood as stating or implying actual and verifiable facts about Chishti that are reasonably capable of defamatory meaning is a threshold question for the court to decide. *Farah*, 736 F.3d at 535. The "publication must be taken as a whole, and in the sense in which it would be understood by the readers to whom it was addressed." *Id.* (quoting *Afro–American Publ'g Co. v. Jaffe*, 366 F.2d 649, 655 (D.C. Cir. 1966)).

The District of Columbia recognizes a "freestanding doctrine" of "fair comment" privilege. *Jankovic v. Int'l Crisis Grp.*, 593 F.3d 22, 29 (D.C. Cir. 2010). The "long recognized" common law doctrine "accord[s] the media the privilege of fair comment on matters of public interest," so long as the opinions expressed are based on true facts. *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 88 (D.C. 1980). The Supreme Court explained that the "fair comment" privilege "was incorporated into the common law as an affirmative defense to an action for defamation" due to "concerns that unduly burdensome defamation laws could stifle valuable public debate." *Milkovich*, 497 U.S. at 13. The privilege affords "legal immunity for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact." *Id.* (citing 1 F. Harper & F. James, Law of Torts § 5.28, p. 456 (1956) (footnote omitted)). In the District of Columbia, the

fair comment privilege can be invoked even when the underlying facts are not included with the comment. *Fisher v. Wash. Post Co.*, 212 A.2d 335, 338 (D.C. 1965) (following Restatement (Second) of Torts § 606 as the "better view"). Because the court affirms on First Amendment grounds, there is no occasion to consider whether the District of Columbia privilege of fair comment became "obsolete" in light of broader First Amendment protections, Appellants' Br. 33 n.4 (quoting *Pearce v. E.F. Hutton Grp., Inc.*, 664 F. Supp. 1490, 1503 (D.D.C. 1987)).

The District of Columbia also recognizes "a fair reporting privilege" that protects "accurate and complete" publications of "official proceedings" published without "malice" and "for the purpose of informing the public as to a matter of public concern." *Oparaugo*, 884 A.2d at 81 (quoting *Phillips*, 424 A.2d at 88); *White v. Fraternal Order of Police*, 909 F.2d 512, 527 (D.C. Cir. 1990) (relying on Restatement (Second) of Torts § 611, cmt. d). "In order to avail [one]self of the privilege, the publisher must give fair attribution to the source of the alleged official record." *Oparaugo*, 884 A.2d at 81. The privilege even shields "the accurate report of even false information" so long as it is "obtained from an official record and proper attribution is given to its source." *Id.*

Chishti maintains that three statements by Spottiswoode to *The Telegraph* on November 18, 2021, are actionable defamation: (1) "Everyone involved in the misogynist culture at Afiniti – there are quite a few – should be held accountable." (2) "Everyone who enabled it should be held accountable. As long as they still have forced arbitration, we can assume this behavior is ongoing." (3) "On a personal level, the board should insist that Afiniti and Chishti pay my father for the stock they seized and for his attorneys['] fees and dismiss the retaliatory arbitration they filed to scare and punish me." Appellants' Br. 30 (quoting Am. Compl. ¶¶ 85, 121, Ex. F). In Chishti's view, "[t]hese statements can be proven true or

false based on a core of objective evidence such as company records and evidence about employees at Afiniti, their treatment of women, whether Afiniti sanctioned ongoing misconduct, and whether Spottiswoode's father's stock was seized." *Id.* at 31 (internal quotation marks omitted). Further, in his view, "[he], as the CEO of Afiniti, will be readily understood by a reader to be one of the individuals 'involved in' or 'enabl[ing]' a misogynist culture at Afiniti" and to have "'seized' Spottiswoode's father's stock and filed a 'retaliatory arbitration' to 'scare and punish' Spottiswoode." *Id.* (alteration in original).

Even assuming a reasonable reader could understand Spottiswoode's statements regarding the "misogynist culture at Afiniti" and "retaliatory arbitration . . . filed [by Afiniti and Chishti] to scare and punish" her to refer to Chishti, the statements are inactionable opinions based on true facts. "[W]hen a [person] gives a statement of opinion that is based upon *true* facts that are revealed to readers or which are already known to readers, such opinions generally are not actionable so long as the opinion does not otherwise imply unstated defamatory facts." *Farah*, 736 F.3d at 539 (quoting *Moldea v. N. Y. Times Co.*, 15 F.3d 1137, 1144–45 (D.C. Cir. 1994) ("*Moldea I*")) (emphasis in original); *Milkovich*, 497 U.S. at 20. That is "[b]ecause the reader understands that such supported opinions represent the [person's] interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation." *Farah*, 736 F.3d at 539 (quoting *Moldea I*, 15 F.3d at 1144–45); *see Florio v. Gallaudet Univ.*, 119 F.4th 67, 77–78 (D.C. Cir. 2024). Read in context as the First Amendment "demands," *Weyrich*, 235 F.3d at 625 (citing *Moldea II*, 22 F.3d at 314), a reasonable reader would understand Spottiswoode's statements to offer opinions, based on her first-hand experience, about true facts: the company's then-existing policy of mandatory arbitration of sexual harassment claims and the then-pending arbitration

action filed by the company against her father. Readers can judge for themselves whether a company (and its CEO) that adopts such policies enables a "misogynist culture" or whether the company's arbitration action filed against Spottiswoode's father after she came forward with allegations of sexual assault was "retaliatory" and filed to "scare and punish" her.

As for Spottiswoode's statement that "[o]n a personal level, the board should insist that Afiniti and Chishti pay my father for the stock they seized" which Chishti alleges they did not take, *see* Am. Compl. ¶ 300, the immediately preceding sentence makes it clear that Spottiswoode is referring to the arbitral action filed by the company against her father, stating that: "Ms. Spottiswoode urged *the company* to drop legal action against her and her father, whom she said had been targeted in an attempt to force her to erase an arbitration ruling against Mr. Chishti." Am. Compl. Ex. F at 4 (emphasis added). A reasonable reader would not conclude that an action taken by the company against the stock of an employee in the course of an arbitral dispute rises to the level of a comment on Chishti's character that could make him look "odious, infamous, or ridiculous." *Weyrich*, 235 F.3d at 627 (quoting *Best*, 484 A.2d at 989). The statement is likewise not actionable in defamation.

Smith's post-hearing statements to *The Telegraph* and posts on *Twitter* are similarly not "susceptible of being proved true or false," Appellants' Br. 34 (citation omitted), and Chishti's claim was properly dismissed. Chishti's position that Smith's posts on *Twitter* contain defamatory statements fail for several reasons. He points, *see* Appellants' Br. 34–35, to Smith's:

(1) November 16, 2021, tweet republishing the video of Spottiswoode's testimony and stating, "Harassers know secret corporate arbitrations will allow them to abuse women without consequences. Watch this riveting testimony & call your Representative to vote to end forced arbitration!" Am. Compl. ¶ 116;

(2) November 17, 2021, tweet reposting a video segment of Spottiswoode's testimony and stating, "@NYCCHR should investigate Afiniti like it investigated Fox 'News.' Tatiana [Spottiswoode] filed a retaliation complaint with the City when Chishti filed a retaliatory arbitration against her father." Am. Compl. ¶ 118;

(3) November 18, 2021, tweet reposting an article from *The Guardian* and stating, "The judge of the matter – in the forum chosen by Afiniti – ruled against Chishti after 14 days of trial. There is no longer a 'dispute' about what happened. It's been decided." Am. Compl. ¶¶ 122, 129;

(4) November 19, 2021, tweet stating, "Forced arbitration enabled [Chishti]. The light of day brought him down. So proud of my client Tatiana Spottiswoode! Thank you @RepJerryNadler @RepCheri @HouseJudiciary @GretchenCarlson @julieroginsky @JusticeDotOrg." Am. Compl. ¶ 86;

(5) July 27, 2022, tweet stating, "Hey @AOC @RepRaskin @RashidaTlaib @CoriBush & @RepMaloney – a subpoena would trump any NDAs these employees have signed. It's how we were able to expose Zia Chishti's horrific behavior at the top of Afiniti. Reach out if you have any questions!" Am. Compl. ¶¶ 94, 131.

Chishti also claims that Smith's statements to *The Telegraph* were defamatory, telling the newspaper that he is a "sexual predator," who "beat[]" Spottiswoode "without her

consent."   Appellants' Br. 35.   He alleged that Smith told *The Telegraph* on November 20, 2021:

> Every single sexual predator has this playbook of saying the harassment was 'welcome'. When I sued Roger Ailes on behalf of Gretchen Carlson, Ailes immediately released a "thank you" note she had written to somehow prove that she consented to his harassment.   Does Chishti claim that Ms. Spottiswoode consented to being beaten? If he is going to violate the confidentiality provisions he imposed, we will answer him with additional photos and information.

Am. Compl. ¶ 125.   Defamatory too, Chishti alleged, is the republication of "Spottiswoode's prepared testimony presented before Congress," and "video clips of Spottiswoode's entire hearing testimony, which [Chishti alleged] included allegations of assault with intent to kill, rape, pedophilia, other criminal conduct" with further unspecified "supporting comments" that are defamatory.   Appellants' Br. 34, 35–36 (citing Am. Compl. ¶¶ 116, 130, 137 & J.A. 141–42).

There are several responses.   Because the court need not consider contentions made by parties "in the most skeletal way," *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005); *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983), the court disregards Chishti's bare and unexplained citations to allegations in the complaint,   Appellants' Br. 34 (citing Am. Compl. ¶¶ 84, 86–87, 94, 105(a), 115–20, 122–27, 129–32, 150); *id.* at 36 (citing Am. Compl. ¶¶ 116, 130, 137).

Also, Smith's republication of Spottiswoode's congressional testimony is a "report about an official proceeding" protected by the fair reporting privilege and therefore not actionable.   *White*, 909 F.2d at 527; *see* Appellants' Br. 34, 37.   Chishti responds that (1) "Smith's

encapsulating tweets do not qualify for the fair report privilege" because "they editorialize," and (2) Smith's statements encouraging the readers of her posts to "[w]atch this riveting testimony" and stating, *inter alia*, "Its been decided," are not "'fair' and 'neutral'" and "impl[y] that the Arbitration [A]ward conclusively decided the truth of each of Spottiswoode's allegations against Chishti." Reply Br. 20 (citing Am. Compl. ¶¶ 116–17, 119, 122). But these statements do not contain any "verifiably false statements of fact," *Weyrich*, 235 F.3d at 623, being either a mere invitation for the readers of her post to view the testimony, or a reference to the existence and outcome of the arbitration.

Further, when viewed, in context, Smith's remaining statements to *The Telegraph* and posts on *Twitter* are not actionable opinions that express or imply verifiably false facts. A reasonable reader would understand Smith's statements to reflect her opinion on public matters: the existence of corporate forced arbitration of sexual assault claims and her client's related testimony before Congress on the subject. In these comments, Smith draws upon her professional legal experience with sexual misconduct complaints and charges, expresses pride for her client for testifying before Congress and her opinion on the subject of forced arbitration in light of her client's testimony, and invites others to act in connection with Congress's consideration of the proposed legislation; none imply unstated defamatory facts. The readers of the statements are "free to draw his or her own conclusions," *Farah*, 736 F.3d at 539 (citation omitted), about the factual basis of Smith's comments; the statements are therefore not actionable in defamation.

Chishti's remaining contention that "[t]he District Court also failed to consider Chishti's allegations of malice that overcome any fair comment privilege," Appellants' Br. 39, is conclusory and unsupported by factual allegations in the amended complaint as well as contrary to matters subject to

judicial notice, including the Arbitral Award issued in Spottiswoode's favor that was entered in the Congressional Record. *Kaempe*, 367 F.3d at 963. And because Chishti has failed to adequately plead defamation and false light against Spottiswoode and Smith, the court need not also consider whether these and other tort claims are barred by the preclusive effect of the Arbitral Award from pleading the element of falsity of a defamation claim.

**IV.**

Count III: Breach of Contract. Chishti contends that the district court erroneously extended the legislative privilege to the breach of contract claim based on Spottiswoode's alleged violation of Protective Order No. 9 "by disclosing Confidential Materials from the Arbitration to Congress prior to, during, and even long after the legislative proceeding in which she testified." Appellants' Br. 39. Chishti also contends that the breach of contract claims against Spottiswoode and Smith were erroneously dismissed because the district court "misinterpreted" Protective Order No. 9. *Id.* at 44–45. Further, he contends that the district court erroneously concluded that he "failed to viably allege that Spottiswoode and her attorney Zweig breached the Protective Order by releasing confidential materials." *Id*. at 3. But many of the alleged breaches were not breaches and the legislative privilege bars the remainder of his claim.

To prevail on a claim of breach of contract, a plaintiff must establish "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Brown v. Sessoms*, 774 F.3d 1016, 1024 (D.C. Cir. 2014) (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)); *see CorpCar Servs. Houston, Ltd. v. Carey Licensing, Inc.*, 325 A.3d 1235, 1244–45 (D.C. 2024). Chishti relies on two protective orders issued by the Arbitrator on the use and

disclosure of confidential materials. Protective Order No. 3 (May 9, 2018) permitted Spottiswoode to speak with her "father and other immediate family members" as well as "law enforcement and medical professionals" about "anything related" to the arbitration. *Id.* at 2. Protective Order No. 9 (Aug. 6, 2018) required: "All materials produced or generated in this Arbitration . . . are not to be further disclosed other than in accordance with" its terms. *Id.* ¶ 2. Confidential materials "include without limitation materials produced in discovery ('Discovery Material'), as well as discovery requests and responses, pleadings, motions, briefs, testimony, transcripts, correspondence, orders, and the award." *Id.*

Chishti maintains that Spottiswoode and Smith violated Protective Order No. 9 on at least four occasions: twice by "present[ing] protected confidential information in her oral testimony to Congress" and in her "written statement provided to" the Committee before the hearing, Am. Compl. ¶ 179(b)–(c), and also by providing a copy of the Arbitral Award to Chairman Nadler, upon request, after Chishti's accusations that Congress did not sufficiently scrutinize the facts underlying Spottiswoode's congressional testimony, *id.* ¶ 179(a), and when Spottiswoode and Smith "inferabl[y]" disclosed "material protected under the Protective Order to procure a subpoena from Congress," *id.* ¶ 179(d). A fifth violation of "the protective order" was allegedly committed by her attorney Zweig in "disclosing the existence and contents of the Award in the arbitration to Spottiswoode's father" and his attorney. *Id.* ¶ 197.

Four of the alleged five breaches of contract claims fail at the outset. Protective Order No. 9 "does not protect against the disclosure of 'confidential information'; it only protects against the disclosure of [defined] 'Confidential Material,'" Mem. Op. 31 (citing paragraph 2). Spottiswoode did not breach Protective Order No. 9 by disclosing the existence of and facts underlying the Arbitral Award. The alleged breach

based on an "infer[ence]," Am. Compl. ¶ 179(d), that Spottiswoode and Smith provided unspecified confidential information to Congress also fails because the inference is "unsupported by the facts set out in the complaint," *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Likewise, the breach claim against Smith fails because Chishti never alleged Smith was a party to Protective Order No. 9 or that she entered into a contract for his benefit, unlike Zweig who allegedly negotiated the protective orders. Mem. Op. 24 (citing *Needham v. Hamilton*, 459 A.2d 1060, 1062 (D.C. 1983)). The breach of contract claim against Spottiswoode's attorney Zweig fails because Protective Order No. 3 permitted Spottiswoode (and by extension her agents) to share information about the existence and contents of the arbitration with her father. *Id.* at 2. Chishti's position that Protective Order No. 9 "effectively superseded" Protective Order No. 3, Appellants' Br. 51, lacks basis in the text of Protective Order No. 9.

Left is Chishti's breach of contract claim based on Spottiswoode's provision of a copy of the Arbitral Award to the House Judiciary Committee Chairman in response to his request. *See* Am. Compl. ¶¶ 179(a). This request came about as the result of Chishti's letter of December 5, 2022, almost a year after the congressional hearing, to a Member of the Committee advising that: (1) he had filed suit against Spottiswoode for the "extraordinary . . . false claims" in her November 16, 2021, testimony, including that he "raped her and . . . attacked her with intent to kill," and (2) he was certain the Member "ha[s] not reviewed the underlying evidence and voluminous communications between Ms. Spottiswoode and [him] that belie her narrative." Chishti Ltr. at 1 (Dec. 5, 2022), Am. Compl. Ex. J. Asserting that Spottiswoode's "personal claims" are not "real," Chishti offered to supply "facts" that "may prove helpful to . . . advancing legislation that redresses the burdens that women have historically faced." *Id.* On December 17, Chairman Nadler wrote to

Spottiswoode, in care of her attorney Smith, that Congress had passed the Act in part due to her testimony and that Chishti had accused the Committee of not reviewing the underlying evidence relating to Spottiswoode's claims. "To ensure maximum accuracy in the congressional record and to inform further the Committee's ongoing work against workplace sexual violence and sexual harassment," Chairman Nadler requested "a copy of the arbitrator's 2019 final ruling." Nadler Ltr. at 1 (Dec. 17, 2022), Ex. I; Am. Compl. ¶ 95. Spottiswoode provided a copy that was placed in the Congressional Record. Am. Compl. ¶ 96.

Chishti contends that the legislative privilege does not bar his breach of contract claim because this court has applied the privilege "only to defamation claims for statements solicited for and during a legislative hearing." Appellants' Br. 39 (emphasis omitted). But Chishti's reliance on *Langeman v. Garland*, 88 F.4th 289, 296–97 (D.C. Cir. 2023), *Webster I*, 731 F.2d at 5, and *Webster II*, 790 F.2d at 159 & n.2, is misplaced; in those cases the court had no occasion to consider the scope of the privilege beyond claims of defamation. His reliance on non-binding district court opinions also does not advance his position. Appellants' Br. 40–41. The D.C. Court of Appeals has not decided the question but traditionally looks to the Restatement (Second) of Torts in considering questions of first impression under District of Columbia law, including in the defamation context, *see, e.g.*, *Competitive Enter. Inst.*, 150 A.3d at 1243, 1250, *Oparaugo*, 884 A.2d at 71, 79, *Phillips*, 424 A.2d at 88, *Fisher*, 212 A.2d at 338; *cf. Whiteru v. Wash. Metro. Area Transit Auth.*, 346 A.3d 1188, 1195 (D.C. 2025). Neither party has requested certification of the question to the D.C. Court of Appeals pursuant to D.C. Code § 11–723(a) (1986). Resolution of the question as would the D.C. Court of Appeals would be straightforward: by applying the Restatement (Second) of Torts as would the D.C. Court of Appeals provides a clear "discernible path for the court to follow." *Metz v. BAE Sys. Tech. Sols. & Servs. Inc.*,

774 F.3d 18, 23 (D.C. Cir. 2014) (quoting *United States v. Old Dominion Boat Club*, 630 F.3d 1039, 1047 (D.C. Cir. 2011)). In fact, this court has done so before in a similar context in *Webster I* and *Webster II*.

Therefore, in interpreting the scope of the legislative privilege under District of Columbia law, the court looks to Section 590A of the Restatement (Second) of Torts and may look to "Maryland law" as "the most authoritative body of law other than" the precedent of the District of Columbia Court of Appeals. *In re C.A.P.*, 633 A.2d 787, 790 (D.C. 1993); *see Solid Rock Church, Disciples of Christ v. Friendship Pub. Charter Sch., Inc.*, 925 A.2d 554, 561 (D.C. 2007). Section 590A states:

> A witness is absolutely privileged to publish defamatory matter as part of a legislative proceeding in which he is testifying or in communications preliminary to the proceeding, if the matter has some relation to the proceeding.

Restatement (Second) of Torts § 590A. Comment a explains that "[t]he absolute privilege of witnesses in legislative hearings and other legislative proceedings is similar in all respects to that of witnesses in judicial proceedings, as stated in § 588," recognizing "that the same interests justifying immunity for statements made in judicial proceedings also underlie immunity for statements made in connection with legislative proceedings," *Webster I*, 731 F.2d at 4 n.7 (citing Restatement (Second) of Torts § 590A, cmt. a). Thus, "cases discussing immunity in the judicial context may help guide [the court's] examination of immunity in the legislative context." *Id*. Elaborating on the common interests behind immunities granted in judicial and legislative proceedings, this court stated:

> This rule of privilege is a compromise between two

important rights, the one being the right of an individual to be free from attack by malicious words and the other the right public and private of a thorough investigation when necessary by some tribunal before which the witnesses may speak without fear. The reason for the rule is applicable as much to a hearing before a committee of the Legislature as to a court of justice.

*Id.* (quoting *Sheppard v. Bryant*, 78 N.E. 394, 400 (Mass. 1906)). In regard to "the purpose of granting immunity to communications addressed to a legislative body," this court looked to the Maryland Court of Special Appeals in stating:

In order for a democratic government to govern democratically, it is necessary that an atmosphere be created whereby facts may be freely presented to the governing legislative body. Without such a free-speaking environment, individuals might be discouraged from addressing their government.

*Id.* at 4 (quoting *Sherrard v. Hull*, 456 A.2d 59, 62 (Md. 1983), *aff'd*, 460 A.2d 601 (Md. 1983), *overruled on other grounds by Miner v. Novotny*, 498 A.2d 269 (Md. 1985)).

The parties point to out-of-circuit precedent examining the application of the litigation privilege to breach of contract claims. Appellants' Br. 42; Appellees' Br. 45–46. Those opinions do not provide hard-and-fast rules. Rather, the courts applying state law have concluded that "the absolute litigation privilege is applicable to breach of contract actions . . . where immunity from liability is consistent with the purpose of the privilege." *Rain v. Rolls-Royce Corp.*, 626 F.3d 372, 377 (7th Cir. 2010) (applying Indiana law); *see, e.g.*, *3500 Sepulveda, LLC v. Macy's W. Stores*, 980 F.3d 1317, 1327–28 (9th Cir. 2020) (applying California law)*, Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197,

1219–20 (11th Cir. 2018) (applying Florida law), *Kelly v. Golden*, 352 F.3d 344, 350–51 (8th Cir. 2004) (applying Missouri law), *abrogated in part on other grounds by Morgan v. Sundance, Inc.*, 596 U.S. 411, 419 (2022); *see Bio/Basics Int'l Corp. v. Ortho Pharm. Corp.*, 545 F. Supp. 1106, 1115–1116 (S.D.N.Y. 1982) (applying New York law and Restatement (Second) of Torts); *Crutcher v. Oncology/Hematology Care, Inc.*, 201 N.E.3d 446, 463 (Ohio 1st Dist. Ct. App. 2022) (applying Ohio law). Consistent with this approach, the Court of Appeals of Maryland reasoned "that the litigation privilege can apply as a defense to claims sounding in contract" because "the privilege would be 'valueless' or 'meaningless' if the opposing party could bar application of the privilege just by drafting the claim with a non-tort label" while "ignor[ing] the possibility that the alleged harm derives from tortious conduct," thereby frustrating the goals of the privilege of "due administration of justice and free expression by participants in judicial proceedings." *O'Brien & Gere Eng'rs, Inc. v. City of Salisbury*, 135 A.3d 473, 485 (Md. 2016) (citations omitted); *see Webster I*, 731 F.2d at 4. There, the litigation privilege barred an engineering company from suing the City of Salisbury for breach of a non-disparagement clause in a settlement agreement predicated on in-court statements of the City's counsel where "the facts material to" the breach of contract claim "were interrelated" with the facts for the alleged defamatory statements of the City's counsel in court. *O'Brien & Gere Eng'rs*, 135 A.3d at 490–91.

It follows, therefore, that the district court properly applied the legislative privilege to Chishti's breach of contract claim. Doing so is consistent with the purpose of the privilege for witnesses testifying in legislative proceedings of creating "an atmosphere . . . whereby facts may be freely presented to the governing legislative body" and avoiding discouraging individuals "from addressing their government." *Webster I*, 731 F.2d at 4 (quoting *Sherrard*, 456 A.2d at 62).

Spottiswoode's provision of the Arbitral Award to Chairman Nadler was prompted by Chishti's accusations that a Member of the House Judiciary Committee had not "reviewed the underlying evidence and voluminous communications" between Spottiswoode and himself "that belie her narrative." Chishti Ltr. at 1. Implicit in Chishti's letter and apparent in the Amended Complaint is that Spottiswoode's provision of the Arbitral Award to Congress and her congressional testimony are interrelated because the testimony is based on "the existence and content of the [Arbitral] Award," Am. Compl. ¶ 183, *see id.* ¶¶ 182–85, 193. Chairman Nadler requested a copy of the arbitrator's 2019 final ruling "[t]o ensure maximum accuracy in the congressional record . . . ." Nadler Ltr. at 1.

Under the circumstances, the legislative privilege for witnesses extends to this breach of contract claim. Without it, Spottiswoode would either be unable to defend herself against Chishti's accusations in his letter to Congress that her protected testimony was false, or face being subjected to a breach of contract lawsuit based on the same defamatory harms – Chishti's workplace sexual misconduct and forced arbitration of these claims under Afiniti's company policy – that were precluded by the application of the privilege to her testimony. Failure to apply the privilege in these circumstances would "discourage[]" potential witnesses like Spottiswoode "from addressing their government" in the first place, hollowing out the privilege. *Webster I*, 731 F.2d at 4 (citation omitted).

In Chishti's view, "[t]he U.S. Supreme Court and other federal circuit courts have made explicit that even the litigation privilege is limited to immunizing only 'defamatory statements.'" Appellants' Br. 42 (citation omitted). Not so. The Eleventh and Ninth Circuits declined to extend the litigation privilege under the applicable state law in *Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1219 (11th Cir. 2018) and *3500 Sepulveda, LLC v.*

*Macy's W. Stores*, 980 F.3d 1317, 1327 (9th Cir. 2020), respectively, but, unlike in the instant case, in those cases, doing so would not have been consistent with the purposes of the privilege. Chishti's reliance on *Tower v. Glover*, 467 U.S. 914 (1984), for the proposition that "the litigation privilege is limited to immunizing only defamatory statements," Appellants' Br. 42, is misplaced because the Supreme Court did not address whether the common law litigation privilege extends to breach of contract claims, holding only that state public defenders did not enjoy common law immunity from liability under 42 U.S.C. § 1983 for "intentional misconduct" based on immunities accorded to historical analogues of public defenders. 467 U.S. at 920–23.

Because Chishti's breach of contract claim based on Spottiswoode's providing of the Arbitral Award to Chairman Nadler fails as a matter of law, the court need not consider whether Chishti failed to state a claim for breach of Protective Order No. 9. *See* Mem. Op. 30–34.

**V.**

Counts IV-VIII: Other related torts. Chishti and his wife plead three causes of action based in tort (tortious interference, abuse of process, intentional infliction of emotional distress) and two causes of action predicated on underlying tort actions (conspiracy and loss of consortium). These related tort claims are part of the alleged defamatory "smear campaign perpetrated by the Defendants against the Plaintiffs," consisting of "falsely accusing Chishti of sexual misconduct and other offensive acts." Am. Compl. ¶¶ 1, 2.

"[P]laintiffs complaining about a defamatory statement cannot end-run the requirements for a defamation claim by pleading" the claims as other causes of action. *Teltschik v. Williams & Jensen, PLLC*, 748 F.3d 1285, 1288 (D.C. Cir. 2014); *Couch v. Verizon Commc'ns Inc.*, 105 F.4th 425, 436

(D.C. Cir. 2024); *Farah*, 736 F.3d at 540. Because the alleged torts are based on the defamatory conduct allegedly perpetrated by Spottiswoode and her attorneys, they are duplicative of the defamation (and false light) claims, and were properly dismissed. The claims of conspiracy and loss of consortium also fail because they are unsupported by underlying tort claims. *Hill v. Medlantic Health Care Grp.*, 933 A.2d 314, 334 (D.C. 2007); *Massengale v. Pitts*, 737 A.2d 1029, 1033 (D.C. 1999).

Finally, appellants' contention that the district court erred in dismissing the amended complaint with prejudice, Appellants' Br. 62, is forfeit. *City of Harper Woods*, 589 F.3d at 1304. They "never moved to amend [the] complaint in the District Court," *id.*, nor proffered "particular grounds on which [an] amendment is sought," *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1259 (D.C. Cir. 2004) (citation omitted).

\* \* \* \*

Accordingly, the court affirms the order dismissing the amended complaint for failure to state a claim pursuant to Rule 12(b)(6) and the order dismissing the case with prejudice.